UNITED STATES of America,
Plaintiff-Appellee,

v.

A. Wendell WHEADON,
Defendant-Appellant.

No. 85–2013.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1986.

Decided July 15, 1986.

Steven R. Greenberger, Arvey, Hodes, Costello & Burman, Chicago, Ill., for defendant-appellant.

Marsha L. Johnson, Asst. U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before HARLINGTON WOOD, Jr., CUDAHY, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant Wendell Wheadon was indicted on 18 counts for his role in a conspiracy to defraud the United States Department of Housing and Urban Development ("HUD"). Following a lengthy bench trial, Wheadon was convicted on 17 counts: Count 1 for conspiring to defraud the United States by obtaining payment on false and fraudulent claims; Counts 3 through 9 for soliciting and receiving money in ex-change for being influenced as a public official to commit fraud on the United States; Counts 10 through 16 for embezzling and converting federal monies to his own use; and Counts 17 and 18 for filing false income tax returns. The defendant was sentenced to seven years imprisonment on Count 1 and Counts 3 through 16, and one year imprisonment on Counts 17 and 18, all to run concurrently. The defendant was also ordered to pay $116,834.68 restitution.

Defendant Wheadon raises four arguments on appeal. He argues that, as a matter of law, the testimony of his accomplice and coconspirator Robert Jacox was insufficient to establish Wheadon's guilt beyond a reasonable doubt. Wheadon argues that the evidence did not establish a fraud against the United States, within the meaning of 18 U.S.C. §§ 286 and 201(c)(2). Wheadon argues that the monies which he was convicted of embezzling and converting in Counts 10 through 16 were not monies of the United States within the meaning of 18 U.S.C. § 641. Finally, Wheadon argues that the restitution order is void because it was not a condition of a probation sentence and it was imposed in connection with an offense that occurred before January 1, 1983. We affirm Wheadon's conviction on all 17 counts, and affirm the trial court's January 10, 1986 corrected sentence order.

**I.**

The facts of this case are set out in detail in Judge Beatty's unpublished memorandum of May 24, 1985. We will only summarize the high points. From late 1979 until July 1982, Wendell Wheadon was Executive Director of the East St. Louis Housing Authority ("Housing Authority"). The Housing Authority received money from HUD to implement various housing projects. It was governed by a five-member board of commissioners, who appointed Wheadon the Executive Director.

In June 1980, Wheadon submitted to HUD an innovative low-income housing project proposal involving two Orr Weath-

ers buildings. HUD approved the proposal on November 5, 1980, and allocated $2,517,-000 to the Housing Authority.

In late 1980, Wheadon, in a personal transaction, entered into negotiations with Booker Ford to lease property in St. Louis, Missouri from James Dwyer to be renovated and used as a restaurant and lounge. Wheadon agreed to provide the capital, with Ford providing the managerial and operating experience. On March 2, 1981, Wheadon and Ford executed a partnership agreement. Wheadon, Ford, and Dwyer signed a commercial lease agreement sometime in March 1981.

Prior to signing the commercial lease, Wheadon asked Robert Jacox to assist him in acquiring a bank loan to renovate the property. Because Wheadon could not post the leased property as collateral, a bank loan was impractical. Since a legitimate commercial loan was unavailable, Wheadon decided upon a "creative financing" scheme, as we see it a little too creative, made possible by his position as Executive Director of the Housing Authority.

Wheadon informed Jacox that the Housing Authority would soon be awarding a large construction contract and that Jacox's company, Franklin Construction Company ("FCC"), would get the contract if Jacox would give Wheadon the monies necessary to renovate the restaurant. In return for Jacox paying Wheadon monies from contracts FCC had with the Housing Authority, Wheadon promised Jacox future Housing Authority contracts and a return of the original money when Wheadon's restaurant opened. Jacox agreed to Wheadon's proposal, at least partially because he believed Wheadon, as Executive Director, could hold up payments on FCC's existing contracts and foreclose future Housing Authority contracts.

In April 1981, FCC submitted the only bid on the construction contract for the Orr Weathers buildings project. On April 7,

1981, Wheadon and Ford, as incorporators and officers, filed Articles of Incorporation for Mr. Ford's Restaurant & Lounge. Renovation work on the restaurant began in early May 1981.

Having arranged all the necessary prerequisites, Jacox and Wheadon began to implement their scheme. It is unnecessary for us to recount the details of each transaction, but in general what happened was as follows. Jacox would prepare and submit to the Housing Authority a request for reimbursement for work allegedly done at Orr Weathers. James Randle, the architect with whom the Housing Authority contracted to design the plans and specifications and to inspect the construction as it progressed, would authorize someone (usually his secretary Carolyn Walker) to certify in his name the completion of the work underlying the payment request, although Randle would not physically inspect the premises. Wheadon would authorize Housing Authority payment by signing the request, and the Housing Authority would issue a check to FCC. Jacox would use part of the payment to purchase a cashier's check payable to Wheadon. This went on from May 15, 1981, until June 14, 1982, and involved at least 20 cashier's checks for $370,881.18. The arrangement ended on July 16, 1982, when Wheadon was fired from his position as Executive Director of the Housing Authority.

The scheme accomplished Wheadon's goal; on July 4, 1982, the newly renovated Mr. Ford's Restaurant & Lounge opened. Following an encouraging start, however, Mr. Ford's business began declining in August.

On August 30, 1982, Randle, the architect, inspected the Orr Weathers project for the first time and determined that approximately $250,000 of work had been completed. Sometime in the fall of 1982, Wheadon, Randle, Jacox, and Walter Avant[1] met at Mr. Ford's to consider how

---

1. In June 1981, Wheadon told Jacox to have FCC hire Phoenix Construction and Management Company ("PCMC") as construction manager on the Orr Weathers contract. Walter

Avant was PCMC's construction manager. Wheadon was aware that the Housing Authority Board was upset that PCMC had received too many Housing Authority contracts. Because

to document more work on the Orr Weathers project. In 1984, Fred Spinti, a HUD Case Analyst, inspected the Orr Weathers project and determined that approximately $135,000 of work had been completed. The Housing Authority had disbursed more than $1,000,000 on the Orr Weathers contract.

Wheadon was charged in an 18-count indictment for his role in this conspiracy. Codefendant Jacox pled guilty to Count 1, conspiracy to defraud the United States by obtaining payment on false and fraudulent claims, and testified for the government against Wheadon. Avant's trial was severed from Wheadon's, and he was subsequently convicted by a jury. Randle had previously pled guilty to making false statements to the government. Wheadon opted for a bench trial, and was found guilty on 17 of the 18 counts.

## II.

■ Wheadon first argues that although "a conviction may properly rest on the uncorroborated testimony of an accomplice, if the testimony is not incredible or insubstantial on its face," *see United States v. Andrews*, 455 F.2d 632, 633 (9th Cir.1972); *see also United States v. Silva*, 748 F.2d 262, 266 (5th Cir.1982), the testimony of Jacox was so incredible as to be insubstantial on its face. Wheadon argues that his own testimony, giving an innocent explanation of the events, is uncontradicted on all material points by anyone other than Jacox. Furthermore, Wheadon argues that Jacox's account is so contradictory and so incredible that without corroboration it is insufficient to prove Wheadon guilty beyond a reasonable doubt.

When reviewing a challenge to the sufficiency of the evidence, we consider "whether the evidence viewed in the light most favorable to the government could support a conviction." *United States v. Liefer*, 778 F.2d 1236, 1247 (7th Cir.1985). Viewed in its most favorable light, the government's

evidence supports Wheadon's conviction. The trial judge was aware that Jacox had a prior felony conviction and had already pled guilty in this case. The judge observed Jacox and listened to his testimony on the witness stand for approximately three days. The judge asked Jacox numerous questions. Wheadon's attorney subjected Jacox to a thorough cross-examination. The judge had the same opportunity to observe and listen to Wheadon. In the end, the trial court concluded that Jacox's testimony was more credible, a conclusion which we do not second-guess. *See Liefer*, 778 F.2d at 1248–49 (appellate court should not substitute its own determination of credibility for that of the trier-of-fact which had an opportunity to observe firsthand the conflicting testimony and demeanor of witnesses).

Furthermore, the trial court found that Jacox's testimony was corroborated by other evidence. For example, Wheadon's defense was based upon his argument that it was actually Jacox, not Wheadon, who was investing in Mr. Ford's. Wheadon claimed that Jacox invested in Mr. Ford's to receive an investment tax credit or tax shelter. The government produced Jacox's 1981 tax return which showed Jacox neither owed nor paid any income tax in 1981. Jacox's tax preparer testified that Jacox did not need an investment tax credit or tax shelter. This clearly contradicted an essential underpinning of Wheadon's defense and corroborated Jacox's testimony.

The trial judge, as trier-of-fact, thoughtfully analyzed the evidence in the case and issued lengthy findings of fact, based upon his assessment of the credibility of the witnesses and corroboration of their testimony. He found the evidence sufficient beyond a reasonable doubt to convict Wheadon, and we hold that the evidence, viewed in the light most favorable to the government, supports the conviction.

PCMC was working for FCC, it could work as construction manager of the Orr Weathers project without receiving Housing Authority

contracts or money directly. PCMC also contracted with Wheadon and Ford to do the renovation work on Mr. Ford's.

## III.

Wheadon contends that the evidence did not establish a fraud against the United States within the meaning of 18 U.S.C. §§ 286 & 201(c)(2). Count 1 was based upon section 286[2] and Counts 3 through 9 were based upon section 201(c)(2).[3] Wheadon argues that the evidence at trial proved, at most, a fraud against the State Housing Authority. According to Wheadon, HUD approved and funded the Orr Weathers project on the basis of accurate representations, and disbursed the funds to the Housing Authority under a program that did not call for ongoing federal supervision of the project or its funding. According to Wheadon, the fact that more than $1,000,000 in HUD funds were fraudulently paid out by Wheadon when only $135,000 of work was completed is insufficient to establish fraud against the United States.

To resolve this issue, we must decide what the government must prove to convict a defendant under section 286 ("defraud the United States") and section 201(c)(2) ("fraud ... on the United States"). Wheadon argues that "[t]he United States must be the victim of a common law fraud involving material misrepresentations relied upon to its financial detriment...." Wheadon argues that HUD approved the Orr Weathers projects and disbursed all the funds (a fixed amount) directly to the Housing Authority before any costs were allegedly incurred and before Jacox submitted any fraudulent requests. Wheadon analogizes this to *United States v. Azzarelli*, 647 F.2d 757 (7th Cir.1981), which involved 31 U.S.C. § 231 (now § 3729), the civil counterpart of § 286. In *Azzarelli*, the court ruled that the "false claim" required by the statute meant a claim "capable of causing an injury to the funds or property of the United States if the claim is in fact paid." 647 F.2d at 759. The court in *Azzarelli* ruled that the United States had no civil claim against contractors who rigged the bidding on a state construction project, although seventy percent of the funds in the account from which the state paid the contractors originally came from federal funds. Judge Cudahy's opinion concluded that "the injury was suffered by the State of Illinois, and it is that governmental body which has a cause of action resulting from the overcharge.... It is Illinois whose treasury funds have been reduced by the overcharges." 647 F.2d at 762.

Several factors distinguish Wheadon's case from *Azzarelli*. Wheadon, as Executive Director of the Housing Authority, was a public official who dealt directly with the federal funds and personally authorized their disbursement. In *Azzarelli*, the federal government negotiated directly with the state, and only after the "project agreement" had been formalized between the state and federal government did the state advertise for bids. Thus, the defendants in *Azzarelli* had contact only with the state and had no role in drawing on the funds from the federal government. Furthermore, the court in *Azzarelli* placed great importance upon the fact that "[t]he ceiling on the federal contribution imposed by the Highway Act ... operated to insulate the United States from any overcharge." 647 F.2d at 761. The court contrasted this to "open-ended federal expenditure programs, such as Medicaid or the Public Works Administration." *Id.* Wheadon's case does

---

2. 18 U.S.C. § 286 provides:
   Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

3. 18 U.S.C. § 201(c)(2) provides for the fine and imprisonment of:

(c) Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:
   (2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States....

not fall clearly within either the *Azzarelli* category of fixed sums of money[4] or the category of open-ended programs. Therefore, *Azzarelli* does not govern the result in this case.

The government contends that, in order to show fraud against the United States, it is sufficient for the government to prove that the defendant committed fraud while acting as a "public official" administering federal funds. Following *United States v. Hinton*, 683 F.2d 195 (7th Cir.1982), *aff'd sub nom. Dixson v. United States*, 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984), which involved substantially the same fact pattern as this case, there is no question that Wheadon falls within the definition of "public official" in section 201(c)(2). In *Dixson*, the Supreme Court noted that

> it becomes clear that these local officials hold precisely the sort of positions of national public trust that Congress intended to cover with the 'acting for or on behalf of' language in the bribery statute. The Federal Government has a strong and legitimate interest in prosecuting petitioners for their misuse of Government funds.... [G]rant funds to state and local governments 'are as much in need of protection from [fraud] as any other federal money, and the statute does not make the extent of [grant monies'] safeguard dependent upon the bookkeeping devices used for their distribution.'

465 U.S. at 500–01, 104 S.Ct. at 1182 (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544, 63 S.Ct. 379, 384,

87 L.Ed. 443 (1943)). The government contends that Wheadon is clearly guilty of defrauding the United States by his acts of cheating the government out of money and interfering with lawful governmental functions, whether in his capacity as a "public official" under section 201(c)(2) or as a "whoever" under section 286.

As the defendant points out in his reply brief, our court in *Hinton* and the Supreme Court in *Dixson* did not face squarely the issue of what constitutes fraud against the United States. That case involved section 201(c)(1), which does not require fraud. Nevertheless, the Supreme Court voiced strong concern about the pervasive evils of public officials misusing federal funds. *See* 465 U.S. at 500–01, 104 S.Ct. at 1182. The Court went so far as to refer to the misuse of "grant funds to State and local governments" as fraud. *Id.* at 501, 104 S.Ct. at 1183. Wheadon argues that sections 286 and 201(c)(2) require "deceit or misrepresentation plus pecuniary loss to the government," but we find it more plausible that Congress intended the statutes to reach the fraudulent disbursement of federal funds by a public officer.[5] We conclude that the government's proof in this case was sufficient to support Wheadon's conviction on Count 1 and Counts 3 through 9.

### IV.

■ Wheadon also argues that the public funds he is charged with embezzling in Counts 10 through 16 were not property of the United States within the meaning of 18 U.S.C. § 641.[6] In determining whether sto-

---

**4.** Wheadon's contention that HUD was insulated from any loss is called into question by the fact that in February 1982, when problems with the Orr Weathers project's bookkeeping surfaced, HUD employee Phyllis Griffin ordered Wheadon not to disburse any more checks without prior HUD approval. That action by HUD demonstrates that HUD maintained an interest in what happened to the funds.

**5.** We therefore find it unnecessary to address Wheadon's contention that HUD was obligated to pay the Housing Authority $2,500,000 whether or not any work was ever done on the Orr Weathers project, thus HUD could not have suf-

fered any pecuniary loss as a result of the funds being fraudulently disbursed. We merely note that HUD paid out over $1,000,000 and received less than $150,000 of work, which is arguably a pecuniary loss, given HUD's limited amount of funds to carry out its congressional mandate to finance low-income housing.

**6.** Section 641 provides:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any

len funds are things of value of the United States, we look to see whether the federal government still maintained supervision and control over the funds at the point when the funds were converted. *See United States v. Scott,* 784 F.2d 787, 790–91 (7th Cir.1986).

■ Wheadon's argument on this issue is based primarily upon what was, for Wheadon, an extremely fortuitous sequence of events. HUD initially transferred $500,000 of Orr Weathers project funds to the Housing Authority on April 3, 1981. The HUD payment went into a general account in which the Housing Authority improperly commingled HUD funds with tenant rent receipts and other funds. On June 2, 1981, HUD transferred an additional $525,000 to the Housing Authority general fund. On June 5, 1981, the Housing Authority overdrew the general fund account by $9,538.75, indicating that all the HUD funds had been disbursed (albeit not for their intended purpose). On July 14, 1981, Wheadon embezzled the funds covered in Count 10, and on July 28, 1981, he embezzled the funds covered in Count 11.

HUD's final transfer of $1,493,823.34 to the Housing Authority for the Orr Weathers project occurred on October 1, 1981. On October 15, 1981, the Housing Authority general fund was again overdrawn. Wheadon's next act of embezzlement (Count 12) did not occur until May 1982. HUD did not transfer any more funds to the Housing Authority during the time Wheadon was embezzling money from the Housing Authority general account (Counts 13–16). Wheadon argues that the indictment alleged only that Wheadon had embezzled funds from the Orr Weathers project, and because these specific HUD funds in the general account were depleted before Wheadon began his embezzlement, the government failed to trace the embezzled money to the HUD funds.

Wheadon's argument fails, however, because the indictment in Counts 10 through 16 alleges that Wheadon embezzled, stole, or converted to his own use "money of the United States Department of Housing and Urban Development." The government presented evidence that other federal funds were paid into the Housing Authority as a monthly operating subsidy. Because these operating subsidies of approximately $100,000 each month were HUD monies, the government's proof conformed to the indictment. We find Wheadon's suggestion that the government stipulated that "evidence of payments from funds other than funds for the Orr Weathers project would be admitted *only* for the tax counts" to be unsupported by Wheadon's reference to the trial transcript. At most, the government stipulated that it would not go into whether or not work was performed on other projects for which Wheadon received money. There is no mention of monthly operating subsidies, or any indication that HUD was limiting the terms of the indictment to money from the Orr Weathers project. Therefore, HUD's proof that it was the source of the embezzled funds was sufficient.

■ That leaves us with the issue of whether HUD maintained supervision and control over the funds at the point when Wheadon embezzled them. HUD presented the testimony of numerous witnesses, as well as the contract between it and the Housing Authority, to demonstrate HUD's retained control of the monies. According to its contract with the Housing Authority and the applicable federal regulations, HUD retained control through: quarterly

department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

   Whoever receives, conceals or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

   The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

reports; HUD's access to all Housing Authority records; the Housing Authority's responsibility to maintain and keep accurate records; HUD's right to terminate any contract; HUD's right to cut off funding and to approve any and all disbursements; HUD's right of prior approval on all contracts, proposals, and appropriations; and HUD's right to conduct on-site inspections. All of these factors suggest that HUD had the right to maintain sufficient supervision and control over the funds for the funds to retain their federal character, even though in fact HUD could qualify as a bungler for its indifference for the proper expenditure of government funds.

■ Wheadon points out, however, that HUD retained no reversionary right to the funds after transmission, *i.e.*, the right to demand that grants be repaid if the money was either unspent or improperly spent. In *Scott*, we said that

> [e]vidence that the federal government monitors and audits programs, regulates expenditures, and has the right to demand repayment of funds is adequate evidence that stolen funds or property were a thing of value of the United States under § 641.

784 F.2d at 791. We therefore must decide whether a reversionary interest in the fund is necessary in order to prove a violation of section 641.

In *Scott*, we merely listed a reversionary interest in the payments as one component of the "adequate" evidence presented by the government in that case. The key factor remained whether the government maintained supervision and control. Wheadon cites no cases which require that the government retain a reversionary interest in the funds in order to prove a violation of section 641, and we believe that such evidence is just one type of evidence, albeit a particularly compelling one, that the government can use to prove that it maintained supervision and control. We find nothing in *Scott*, or any of the cases cited by the defendant, that is inconsistent with our view.

We conclude, therefore, that the government produced sufficient evidence at trial to support a finding that Wheadon stole a thing of value from the United States. We therefore affirm Wheadon's conviction on Counts 10 through 16.

### V.

■ Wheadon's final argument is that the district court's restitution order, ordering Wheadon to make restitution of $116,834.68, is void because it was not a condition of a sentence of probation and was imposed in connection with an offense that occurred before January 1, 1983. *See United States v. Elkin*, 731 F.2d 1005, 1010 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984). The government concedes that Wheadon is correct. This issue is apparently moot, however, because the trial court entered an order correcting the sentence on January 10, 1986.

### VI.

For the reasons given above, the district court's judgment, as amended by the January 10, 1986 correction of sentence, is AFFIRMED.