UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael J. OBERHARDT,
Defendant–Appellant.

No. 89–1503.

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1989.

Decided Oct. 18, 1989.

L. Lee Smith, Asst. U.S. Atty., Peoria, Ill., for U.S.

John A. Hoekstra, Katz, McAndrews, Balch, Lefstein & Fieweger, Rock Island, Ill., for Michael J. Oberhardt.

Before BAUER, Chief Judge, and CUMMINGS and FLAUM, Circuit Judges.

BAUER, Chief Judge.

Stolen goods will generally fetch a price less than their retail or wholesale market value since the seller need not cover the actual costs of production and will often be interested in a quick turnover. At the same time, the fence may seek a discount in light of the risks associated with receiving "hot" goods, or because the seller cannot offer a warranty. That is not to say that these general characteristics regarding the valuation of goods in the "thieves' market" are applicable to every transaction. The facts presented in this appeal involve such a circumstance. The appellant paid an Army employee over four times as much for a document that he could have legitimately obtained from the government for $45.25. A jury subsequently found him guilty of receiving governmental property in violation of 18 U.S.C. § 641 and supplementing a governmental employee's salary in violation of 18 U.S.C. § 209(a). The central question before us is whether the $200 price that the appellant paid for the document in the "thieves' market"—as opposed to its legitimate purchase price of $45.25—is the appropriate measure of the market value of the item for the purposes of sentencing under § 641. We affirm.

## I.  Background

Michael Oberhardt, a partner with a defense contract consulting firm, served as a consultant to manufacturers doing business with the Armament, Munitions, Chemical Command ("AMCCOM") at the Rock Island, Illinois, Arsenal ("Arsenal"). While at the Arsenal on January 6, 1989, Oberhardt overheard Scott Bridge, a clerk with the small purchases division of the Arsenal, say that he had a current copy of the Federal Supply Code for Manufacturers list ("FSCM"). The FSCM is a non-classified, computer print-out of the names, addresses and other information regarding AMCCOM contractors. Oberhardt approached Bridge a few minutes later in a stairwell of the Arsenal and offered to pay him $200 for a copy of the FSCM. Bridge accepted the offer, and on the following day, he phoned Oberhardt from the Arsenal to tell him that a copy of the list was ready. Later that day, the two met in a hallway of the Arsenal to consummate the transaction. Bridge handed over a copy of the FSCM wrapped in a brown bag and Oberhardt gave Bridge $200 in cash. Oberhardt told Bridge that if anyone were to ask, he should say that the money was to cover the cost of printing the list. Before leaving, Oberhardt reminded Bridge that he could lose his job by selling a copy of the FSCM.

The Criminal Investigation Division Fraud Team at the Arsenal got wind of the deal and interviewed Bridge. Bridge confessed to selling the document, and as part of his agreement to cooperate, he allowed the FBI to record a contrived telephone conversation with Oberhardt. Bridge called Oberhardt and told him that he had received a grand jury subpoena, seemingly related to their transaction regarding the FSCM. Oberhardt assured Bridge that the subpoena had nothing to do with their deal. Nonetheless, Oberhardt told Bridge to claim that he won the $200 by gambling on a sporting event. As for his part, Oberhardt stated that he would lie to the grand jury if called to testify; he urged Bridge to do the same.

Oberhardt was subsequently arrested and indicted for bribery in violation of 18 U.S.C. § 210, receiving stolen governmental property in violation of 18 U.S.C. § 641, supplementing a governmental employee's salary in violation of 18 U.S.C. § 209(a), and improperly compensating a governmental employee in violation of 18 U.S.C. § 203. The trial court dismissed the improper compensation count before trial. Upon hearing the evidence, a jury acquitted Oberhardt of the bribery charge and found him guilty of receiving stolen goods and supplementing Bridge's salary.[1] After the district court denied Oberhardt's post-trial motions for acquittal and a new trial,[2] the defendant timely filed this appeal.

## II. Analysis

On appeal, Oberhardt's initial challenge is to his conviction under 18 U.S.C. § 641. He argues that the district court incorrectly ruled that the $200 paid by Oberhardt for the FSCM constituted the value of the list for the purposes of § 641. Oberhardt contends that on its face, § 641 does not contemplate valuing the goods according to their price in the "thieves' market" when the legitimate commercial price of the goods is available. Alternatively, he claims that under the rule of lenity, the statute should be strictly construed in his favor on this issue. We find each of these claims to be without merit.

The starting point for addressing this claim is the plain wording of statute. *United States v. Podell*, 869 F.2d 328, 331 (7th Cir.1989). If Congress has spoken in terms that are clear and definite, the rule of lenity—a doctrine of last resort—does not come into play. *United States v. Lowe*, 860 F.2d 1370, 1376 (7th Cir.1988) (citing *Russello v. United States*, 464 U.S. 16, 29, 104 S.Ct. 296, 303, 78 L.Ed.2d 17 (1983)). In pertinent part, the federal larceny statute provides that:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another ... any record, voucher, money, or thing of value of the United States or of any department or agency thereof, ... or Whoever receives, conceals, or retains the same with intent to convert it to his own use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1000 or imprisoned not more than one year or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

18 U.S.C. § 641.

It is evident from the last paragraph of § 641 that Congress sanctioned a number of different methods of valuation for the purposes of determining whether a violation should be classified and sentenced as a misdemeanor or as a felony. It is now well settled that the valuation of stolen goods according to the concept of a "thieves' market" is an appropriate method for determining the "market value" of goods for the purposes of § 641. In one of the earlier cases on the subject, for example, the Eighth Circuit rejected the argument that the "value measure contemplated by § 641 is restricted to an open market price 'between honest, competent and disinterested men.' We apply to the statute what we feel is obvious, and certainly its practical meaning, namely, the amount the goods may bring to the thief." *Churder v. United States*, 387 F.2d 825, 833 (8th Cir.1968). This circuit has approved the use of the "thieves' market" as a method of valuation consistent with the term "market value" as it is employed in 18

---

1. The trial court fined Oberhardt $5000 and sentenced him to two years probation, with the first thirty days of the term to be served in a work-release facility.

2. In his motion for a new trial, Oberhardt alleged that the government failed to disclose the commercial price of the FSCM in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court found that the government did violate *Brady* but that the suppressed evidence was not material since it was proper to convict the defendant based on the $200 price he paid for the document.

U.S.C. § 2311. *United States v. Berkwitt*, 619 F.2d 649, 657 (7th Cir.1980). *See also United States v. Bakken*, 734 F.2d 1273, 1278–79 (7th Cir.1984).

Oberhardt does not dispute that the "thieves' market" may provide a legitimate measure of valuation of stolen goods. Rather, he selectively cites to three cases for the proposition that reliance on the actual price paid in the "thieves' market" is inappropriate where there is a readily ascertainable commercial price for the goods. The initial difficulty with this proposition is that none of the cases he relies upon directly holds that the commercial price of the goods should trump the actual price the thief receives for the goods in an illegitimate transaction. *See United States v. Bigelow*, 728 F.2d 412, 414 (9th Cir.1984); *United States v. DiGilio*, 538 F.2d 972, 979 (3rd Cir.1976); *United States v. Devall*, 462 F.2d 137, 143 n. 16 (5th Cir.1972). In fact, such an interpretation of § 641 would make no sense where, for example, the unlawful purchaser is willing to pay more than the legitimate price of the goods to obtain them secretly or more quickly than would be possible through legitimate channels.

An additional difficulty with Oberhardt's proposition is that it completely overlooks both the manner in which a market functions and the fact that any number of markets may exist for goods at any particular time, including one composed of thieves and fences. Accordingly, this court has drawn upon classical economic principles to define the term "market value" as it is employed in the identical valuation language of 18 U.S.C. § 2311. In *Bakken* we held that "market value" of stolen goods is measured by the "price a willing buyer will pay a willing seller either at the time and the place the property was stolen or at any time during the receipt or concealment of the property." *Bakken*, 734 F.2d at 1278 (citing *Berkwitt*, 619 F.2d at 657). *See also United States v. Perry*, 638 F.2d 862, 865 (5th Cir.1981). This definition is equally applicable to § 641. In light of this court's interpretation of the term "market value," Oberhardt's conviction of violating § 641 is affirmed.[3]

■ Oberhardt's second challenge on appeal is to his conviction for supplementing Bridge's governmental salary in violation of 18 U.S.C. § 209. Oberhardt claims that his conviction cannot stand because Bridge was not performing a service as a governmental employee when 'he sold the FSCM for $200, as required by the statute. Section 209 provides in pertinent part:

Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of ... any independent agency of the United States Government, or ... from any source other than the Government of the United States ...; or

Whoever ... pays, or makes any contribution to, or in any way supplements the salary of, any such officer or employee under circumstances which would make its receipt a violation of this subsection—

Shall be fined not more than $5000 or imprisoned not more than one year, or both.

18 U.S.C. § 209. We need not parse the wording of § 209 or delve into its legislative history to address Oberhardt's claim, for he testified at trial that he thought Bridge was acting within the scope of his duties in providing a copy of the list. The following exchange during trial is instructive:

COUNSEL: Did at any time or at any time he gave you the list or at any time prior to that ever say or suggest in any way that what he was doing was not— was wrong or not right?

OBERHARDT: No sir.

COUNSEL: Did Mr. Bridge at any time during those days that he talked to you say or do anything that would have led you to believe that what he was doing wasn't right?

OBERHARDT: No sir.

3. Oberhardt also argues that the determination of whether the price he paid for the goods was sufficient to support a felony conviction should have been left to the jury. To the extent that he was convicted by the jury according to the charges in the indictment, it was.

COUNSEL: Did he ever appear to be trying to hide or conceal what he was doing from anybody else?

OBERHARDT: No sir.

The foregoing testimony gave the jury ample grounds for concluding that Oberhardt was seeking to supplement Bridge's salary for services. Accordingly, Oberhardt's conviction is hereby AFFIRMED.