**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Gordana KRISTOFIC, Defendant-Appellant.**

No. 87-1113.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 1988.

Decided June 13, 1988.

Robert S. Bailey, Chicago, Ill., for defendant-appellant.

David M. Taliaferro, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, POSNER, and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

Appellant Gordana Kristofic was convicted, after a jury trial in November 1986, of converting $50,000 of United States funds, specifically the proceeds of a loan from the Small Business Administration (the "SBA"), in violation of 18 U.S.C. § 641. She was sentenced to one year and one day in jail and assessed a $1,000 fine. This appeal presents the novel question whether one who misapplies the proceeds of a federal government loan may be charged with conversion of United States property. We conclude that under the circumstances before us this conduct does not violate 18 U.S.C. § 641, and we reverse.

I.

The appellant opened Gordana's Restaurant in Chicago in 1981. In January 1982,

she applied for an SBA loan, requesting $60,000 for leasehold improvements, new equipment and working capital. She supplemented her application with documents relating to the planned use of the proceeds, including a proposal prepared by Reston Enterprises describing the desired equipment and leasehold improvements.

On December 1, 1982, the SBA issued Kristofic a $39,000 check made out to "Gordana Kristofic d/b/a Gordana's Restaurant and Reston Enterprises." A second check for $21,000, representing the working capital portion of the loan, bore only Kristofic's name. The loan agreement signed by Kristofic specified the respective amounts of the proceeds allocated for leasehold improvements, new equipment and working capital. Kristofic agreed, among other things, to keep books according to SBA standards, to allow the SBA to inspect and audit her books, to submit semi-annual reports and financial statements and to obtain prior SBA approval of plans and specifications for leasehold improvements. The loan agreement provided that none of its provisions would be deemed waived without the SBA's prior written consent. Kristofic certified that she would use the proceeds as agreed.

Less than a month after receiving the checks, Kristofic closed Gordana's. James Reston of Reston Enterprises endorsed the $39,000 check and turned it over to Kristofic, never performing any of the proposed work at the restaurant. Rather than putting the funds to their intended use, Kristofic applied some of the money to pre-existing debts, made a down payment on a car, lent $12,000 to a friend unconnected with the restaurant and apparently kept $3,000 in cash. In April 1983, Kristofic moved to Texas and invested the remaining proceeds in the "Texas Renegades," a bar which failed a few months after opening. The SBA did not receive notice of or approve any of these expenditures. In June 1983, however, appellant informed the Chicago SBA office that she was planning to move to Texas and requested that her records be transferred to Houston. She did not, at that time, notify the SBA of her use of the loan proceeds. The SBA did transfer her file to Houston, but when Kristofic stopped making payments shortly thereafter, it began an investigation.

At her trial, Kristofic denied knowing that she was required to obtain SBA approval before spending the money other than as agreed at the loan closing. She stated that she made a good faith business decision to close Gordana's and invest instead in the bar. Besides her conviction under 18 U.S.C. § 641, which is on appeal here, she was convicted of knowingly submitting a forged lease with her loan application (18 U.S.C. § 1001) but acquitted of submitting a false list of equipment and furniture. She has not appealed the section 1001 conviction.

## II.

Kristofic contends on appeal that the government failed to establish an essential element of a violation of 18 U.S.C. § 641, that she converted "a thing of value of the United States."[1] She argues that once the loan funds were in her hands, they were her property, and the government's only claim was to repayment according to the terms of the loan.

As a matter of basic principles, loan proceeds do not remain the property of the lender. See Calcasieu–Marine Nat'l Bank v. American Employers' Ins. Co., 533 F.2d 290, 296 (5th Cir.1976) (the "classic definition" of a loan is "a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows"). In the case of the usual commercial loan, if the borrower breaches the conditions of a loan agreement, the lender may, for example, accelerate payment according to the terms of the loan agreement, but the borrower is not subject to prosecution for

---

1. 18 U.S.C. § 641 provides:
   Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another ... any ... money, or thing of value of the United States ... shall be fined not more than $10,000 or imprisoned not more than ten years, or both....

theft, embezzlement or conversion. Although the level of oversight by the SBA in the transaction before us is perhaps unusually detailed and pervasive, the degree of oversight does not change the fundamental nature of the transaction or create a governmental property interest in the loan proceeds. Undertaking an obligation to repay and agreeing to conditions contained in loan documents do not make a debtor a trustee for her creditor; the creditor does not, by virtue of these conditions, remain in any degree the owner of the proceeds.

The Supreme Court analyzed these relationships in *United States v. Johnston*, 268 U.S. 220, 45 S.Ct. 496, 69 L.Ed. 925 (1925), in which the Court vacated a conviction for embezzlement. In *Johnston*, the defendant sold tickets for admission to a boxing contest and failed to pay the federal tax on the tickets. Reversing his conviction for embezzling that part of the ticket price which represented the tax, the Court said, "It seems to us that … the person required to pay over the tax is a debtor and not a bailee." *Id.* at 226–27, 45 S.Ct. at 496; *Cf. United States v. Mason*, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133 (1910) (where a debtor-creditor relationship exists, unlawful retention of funds by debtor is not embezzlement). Kristofic's misapplication of the funds was not a conversion because the government no longer held a property interest in them. While the government obviously retained a contractual right to be repaid, it had no interest in any particular fund representing the proceeds of the loan.

The seminal case construing section 641 is *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). *Morissette* found that the legislative purpose in enacting section 641 was to codify the common law crimes of larceny and embezzlement as well as crimes that "shade into" those crimes.[2] *Id.* at 266 n. 28, 72

S.Ct. at 251 n. 28. The Court likened section 641 to other codifications of similar common law crimes, such as statutes prohibiting the unlawful taking or retaining of property by one *other than* the true owner.[3] *Id.* at 272–73, n. 32–33, 72 S.Ct. at 254 n. 32–33. It is thus axiomatic that conversion must involve the property of *another*, not the property of the defendant. *See Chiaramonte v. Immigration and Naturalization Service*, 626 F.2d 1093 (2nd Cir. 1980) (specific proof of rightful owner of property not necessary; larceny proven when prosecution demonstrates that property was taken with knowledge that it belonged to one other than the thief). There is no rational basis for extending section 641 to a situation in which the "thing of value" is actually the property of the alleged converter. *See Morissette*, 342 U.S. at 271–72, 72 S.Ct. at 254.

Of course, traditional notions of conversion contemplate situations in which the property comes into the purported converter's possession lawfully. *Id.* at 272. These circumstances, however, encompass a trust or a bailment, not a loan. *Id.* (conversion may include misuse of "property placed in one's custody for limited use"). These situations and the principles governing them are of no help to the government here. In the case before us, the government relinquished its interest in the particular funds lent to Kristofic, retaining only the right to be repaid an equivalent sum of $60,000 with interest. In fact, Kristofic was prosecuted, not for refusing to pay back the money, but for breaching the conditions of the loan agreement.

The government argues that it did retain a property interest in the loan proceeds and cites a line of Seventh Circuit cases applying the so-called "supervision and control" test. We have in the past applied this test to determine whether property, after distribution to some local or state agency or

---

**2.** The Court also stated that in interpreting the federal conversion statute, courts are to apply the principles governing the common law crime of larceny. *Id.* at 266, n. 28, 72 S.Ct. at 251 n. 28.

**3.** For example, the Court cited The Larceny Act of 1916, 6 & 7 Geo. V., c. 50, and the New York Penal Code, section 1290. The latter defines larceny as wrongfully taking, obtaining or withholding a thing of value "from the possession of the true owner."

entity, retains its "federal" character. If the federal government maintains sufficient supervision and control over the property, we have held that the funds remain government property for purposes of federal prosecution under section 641. *See, e.g., United States v. Wheadon,* 794 F.2d 1277 (7th Cir.1986); *United States v. Bailey,* 734 F.2d 296 (7th Cir.1984); *United States v. Maxwell,* 588 F.2d 568, (7th Cir. 1978). All these cases are quite distinguishable from the case at bar since in these cases there had indisputably been a conversion, an embezzlement, a theft or a misapplication of funds; the only issue was whether the misconduct in question was directed at the United States government and was prosecutable by it under federal law.

This circuit first applied the supervision and control test in *United States v. Maxwell, supra.* The defendant in that case headed the accounting office at a state junior college, administering the distribution of federal funds in financial aid programs. Department of Health, Education and Welfare funds were held in a bank account in the name of the Illinois Junior College Board. Maxwell authorized deposits of federal funds into this parent account as well as transfers from the parent account to four student financial aid programs. Maxwell was convicted under section 641 of drafting checks to non-existent students and falsifying records to conceal improper transfers from the parent account to the financial aid programs. The issue in that case was whether the funds, which had unquestionably been converted, were "money, or a thing of value of the United States." Kristofic's case is, of course, fundamentally different; here, the question is whether Kristofic stole the funds at all, not from whom she stole them.[4]

The same is true of our cases following *Maxwell* cited by the government. For example, in *Bailey v. United States, supra,* an attorney for the Farmers Home Administration embezzled funds in the form of loan checks which were endorsed by borrowers and turned over to him as loan closing money. The defendant argued that section 641 did not apply because once the borrowers endorsed the checks, they were the borrowers' property, not the government's.[5] Again, the question presented was who owned the embezzled property, not whether the defendant had embezzled it.[6]

There was a recent application of the supervision and control test in *United States v. Wheadon, supra.* Wheadon, the director of a local housing authority, was charged with embezzling Housing and Urban Development funds. Wheadon maintained that the funds were no longer the property of the United States, but were instead that of the local authority. We held the supervision and control test applicable to determine whether the stolen funds were property of the United States. *Id.* at 1284. *Wheadon* is inapplicable because the SBA funds in question here were not stolen or embezzled. The same analysis also distinguishes the remaining cases upon which the government relies. *See United States v. Brown,* 742 F.2d 359 (7th Cir.1984) (defendant negotiated checks which had been stolen from county economic development association; HUD control over funds held sufficient to invoke section

---

4. Although *Maxwell* held that actual title need not remain in the United States, it did require that the United States maintain some property interest in the purloined funds. 588 F.2d at 573. The government retained no such interest in Kristofic's loan funds.

5. In *Bailey,* we adopted the reasoning of the Fifth Circuit in *United States v. McIntosh,* 655 F.2d 80 (1981), which held that the borrowers' involvement was limited to endorsing the checks to facilitate disbursement by the attorney; thus the funds were money of the United States in the attorney's possession.

6. In *United States v. Harris,* 729 F.2d 441 (7th Cir.1984), the same question arose in the context of a statute prohibiting embezzlement by employees of federal agencies. *See* 18 U.S.C. § 657. Harris, a Chicago Housing Authority employee, stole six boxes of tile paid for by a HUD grant. Considering HUD's close supervision of the grant money, we held that conversion of the funds into tangible property did not extinguish the federal government's interest. We noted also that the federal government has a greater interest than the states in deterring theft of federal property. *Id.* at 445.

641); *United States v. Scott,* 784 F.2d 787 (7th Cir.1986) (checks stolen from a local community action agency that received federal funding; government oversight sufficient for section 641 to apply).

In the supervision and control cases cited by the government, the defendants were involved in the administration of federally-funded programs from which they unquestionably misappropriated funds. We applied the supervision and control test to determine ownership as between the federal government and an organizational "conduit"[7] for federal funds. The government now seeks to apply the same test to determine ownership as between the government and the defendant; that is, to determine whether Kristofic converted the funds at all. But the test was conceived as a means of resolving the jurisdictional question whether the crime committed had been against the federal government. In the case before us, the question of ownership is posed to address a different inquiry altogether: whether Kristofic converted government property or instead merely misapplied her own money in violation of a loan agreement.

In each of the cases the government cites, it exercised supervision and control over its own funds which it had disbursed through local agencies, and in so doing retained a property interest in the funds for some purposes. While the SBA intended to retain control over Kristofic's loan funds through a loan agreement, that agreement's restrictions gave the SBA no ownership interest in the proceeds. It is undisputed that Kristofic flagrantly violated the terms of her agreement with the SBA and that her transgressions apparently eluded the SBA's mechanisms for enforcing loan agreements; but her conduct does not, in a creditor-debtor relationship, support a criminal prosecution for conversion of government property. The government is asking us here to apply section 641 not in a way which merely extends or reinforces the underlying common-law concepts but in a way which flatly contradicts the common law.

One case upon which the government relies may warrant particular attention. In *United States v. Croft,* 750 F.2d 1354 (7th Cir.1984), a professor misappropriated the services of a research assistant, paid with grant funds, to pursue a profit-making venture, rather than applying the money as agreed in the terms of his Environmental Protection Agency grant. Although the defendant received the money in the form of a grant, we held the government's level of supervision and control over the funds sufficient to apply section 641. The defendant in *Croft,* however, in effect held the funds in trust for the government, with an obligation to disburse the funds as contemplated, not for personal ends.[8] Kristofic, as a debtor, was not a trustee for her creditor. More importantly, *Croft* does not address whether a conversion has been committed; rather, it addresses whether *services* are a "thing of value" under section 641.

As the Supreme Court made clear in *Morissette,* section 641 builds on the common law. The crime of conversion contemplates the deprivation of a property interest. A loan transaction in itself does not confer on the creditor any interest in the debtor's property. If such an interest is to be acquired, it is usually accomplished through the transfer of a security interest. In addition, there might be a crime against property if a debtor secured a loan *intending* not to repay it. Lacking any of these or like elements, however, the stuff of conversion is lacking here.

REVERSED.

---

7. The money in those cases was in the hands of government trustees or administrators of local agencies, and never reached those intended to be the ultimate recipients of the funds.

8. In the case before us, the loan was, like other such loans, for Kristofic's commercial benefit. It was not a research grant administered by Kristofic, which she diverted to her own commercial purposes.