# Illinois Official Reports

## Appellate Court

*National Life Real Estate Holdings, LLC v. Scarlato*, 2017 IL App (1st) 161943

| | |
|---|---|
| Appellate Court Caption | NATIONAL LIFE REAL ESTATE HOLDINGS, LLC, Plaintiff and Citation Petitioner-Appellant, v. RONALD SCARLATO, Defendant (International Bank of Chicago, Citation Respondent-Appellee). |
| District & No. | First District, First Division <br> Docket No. 1-16-1943 |
| Filed <br> Rehearing denied | July 24, 2017 <br> August 23, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-36838; the Hon. Alexander White, Judge, presiding. |
| Judgment | Order vacated and remanded with directions. |
| Counsel on Appeal | Donald A. Murday, David J. Novotny, and Stuart F. Primack, of Chittenden, Murday & Novotny LLC, of Chicago, for appellant. <br><br> Michael Lee Tinalgia, of Law Offices of Michael Lee Tinalgia, Ltd., of Park Ridge, for appellee. |
| Panel | PRESIDING JUSTICE CONNORS delivered the judgment of the court, with opinion. <br> Justice Harris concurred in the judgment and opinion. <br> Justice Mikva dissented, with opinion. |

**OPINION**

¶ 1     Plaintiff, National Life Real Estate Holdings, LLC (National Life), appeals the trial court's ruling that denied its motion for entry of judgment against third-party citation respondent, International Bank of Chicago (IBC), arguing that the court's decision was improper where after being served with a citation, IBC violated the restraining provision of the citation by extending a loan to judgment debtor, Ronald S. Scarlato. National Life specifically asserts that the citation was violated when IBC advanced and disbursed proceeds of the loan to third-parties on behalf of Scarlato. IBC responds that the trial court was correct in denying the motion for entry of judgment because National Life has not and cannot establish that IBC ever held property "belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her." See 735 ILCS 5/2-1402(f)(1) (West 2012). We reverse the trial court's decision to deny National Life's motion for entry of judgment.

¶ 2                                    I. BACKGROUND

¶ 3     This case stems from an approximately $3.5 million judgment entered against Scarlato and the resulting supplementary proceeding in which National Life attempted to collect the judgment amount by serving IBC, a bank that conducted business with Scarlato, with a third-party citation to discover assets. Ultimately, National Life became aware that IBC had entered into a loan agreement with Scarlato after being served with the citation and moved to enter judgment against IBC as a result of its alleged violation of the citation, which prohibited the transfer of any property belonging to Scarlato.

¶ 4     Prior to entering into the $3.5 million "Construction Loan Agreement" (agreement) and promissory note (note) that form the basis of the dispute here, IBC held a $4 million note from Scarlato and two limited liability corporations for which he was the managing member, Bellwood Place, LLC (BP), and Scarlato Holdings Bellwood Place, LLC (SHBP), dated September 19, 2008 (September 2008 note), and a $2.6 million note from Scarlato, BP, and SHBP, dated October 19, 2012 (October 2012 note). Both of the notes contained a "right of setoff" provision that stated:

> "To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts."

The September 2008 note and the October 2012 note were both secured by second and third position mortgages on the subject property, located at 110 North 25th Avenue in Melrose Park (property). These mortgages were granted as collateral to IBC by BP and SHBP, the two owners in fee simple of the property, with each having an undivided 50% ownership interest. The property is a parcel of land that measures over 19.4 acres and is improved with a mixed-use 543,044 square-foot building. The first floor of the building is commercial retail and the second floor is residential condominiums. As of August 1, 2013, IBC held a total debt of approximately $14 million relating to the property. Also as of that date, the construction on

the property was only about halfway complete. An appraisal report dated February 13, 2013, valued the property, as is, at $12,015,000, with the completed property valued at $16.2 million.

¶ 5 In November 2012, National Life obtained a judgment in the amount of $3,424,228.97 against Scarlato, Division Street Place, LLC, and Scarlato Holdings Division St. LLC, jointly and severally. Thereafter, National Life began supplementary proceedings in an attempt to collect the judgment amount. On April 12, 2013, National Life issued a third-party citation to discover assets directed to IBC. The citation was served on IBC on April 13, 2013, and contained the following prohibitive provision:

"[You are prohibited] from making or allowing any transfer or other disposition of or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings. You are not required to withhold the payment of any money beyond double the amount of the judgment."

IBC filed its initial response to the citation on May 7, 2013, and supplemented its response on two subsequent occasions.

¶ 6 On August 1, 2013, nearly four months after IBC was served with National Life's third-party citation to discover assets, Scarlato, BP, and SHBP applied for a $3.5 million loan from IBC and entered into the agreement. The agreement listed IBC as the lender, and Scarlato, BP, and SHBP as the borrowers. Scarlato executed and signed the agreement three times and in three ways: individually, on behalf of himself, and in his capacity as the managing member of BP and SHBP. Scarlato also executed and signed the note in conjunction with the agreement on August 1, 2013, by signing three times and in the same three ways.

¶ 7 On August 1, 2013, in addition to the agreement and note, Scarlato, BP, and SHBP entered into an assignment of construction contracts (assignment) that granted, transferred, and assigned to IBC all of the borrowers' present and future rights, title, and interest in and to the construction contract with CMG Construction Management Group, Inc., the general contractor. The assignment provided that IBC was not allowed to exercise any rights of Scarlato, BP, or SHBP unless and until a default occurred. Scarlato executed and signed the assignment three times and in three ways: individually, on behalf of himself, and in his capacity as the managing member of BP and SHBP.

¶ 8 Per the terms of the agreement, the term "borrower" was to apply to Scarlato and the LLCs, jointly and severally. Regarding who was authorized to request advances and authorize payments under the line of credit, the agreement only listed: "Ronald Scarlato, Managing Member of Bellwood Place, LLC; Ronald Scarlato, Managing Member of Scarlato Holdings Bellwood Place, LLC; and Ronald Scarlato, Individually." In pertinent part, the agreement further stated that,

"Application for Advances. Each application shall be stated on a standard AIA payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require. Borrower shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project. Each application for an Advance shall be deemed a certification of Borrower that as of the

date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is in compliance with all of the provisions of this Agreement.

Payments. At the sole option of Lender, Advances may be paid in the joint names of Borrower and the General Contractor, subcontractor(s), or supplier(s) in payment of sums due under the Construction Contract. At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Constructions Contract. Borrower appoints Lender as its attorney-in-fact to make such payments."

¶ 9    On August 1, 2013, the borrowers requested a $3.5 million "advance" under the agreement and instructed IBC to disburse and pay all the loan proceeds to Greater Illinois Title, the construction escrow agent. Scarlato executed the disbursement request and authorization three times and in three ways: individually, on behalf of himself, and in his capacity as the managing member of BP and SHBP. From August 2013 to March 2014, IBC disbursed $3.5 million pursuant to the agreement but not all proceeds went to Greater Illinois Title. On August 23, 2013, IBC credited $1.51 million of the $3.5 million loan to an IBC account designated with account No. 80063. Also on August 23, 2013, IBC issued the following loan cashier's checks from account No. 80063, payable from the proceeds of the $1.51 million that was credited to the loan: $565,000, payable to BP, $675,000, payable to ID Investment Capital, LLC, and $270,000, payable to BP. Then, on November 18, 2013, IBC credited an additional $528,000 to the loan by placing the proceeds into account No. 80063 and issued a loan cashier's check in the amount of $528,000 payable to Greater Illinois Title, which was drawn from account No. 80063 and payable from the proceeds credited to the loan on that same date. Similarly, on March 26, 2014, IBC credited an additional $1,462,000 to the loan by placing the proceeds into account No. 80063 and issued a loan cashier's check in the amount of $1,462,000, payable to BP, drawn from account No. 80063 and payable from the proceeds credited to the loan on that same date. The loan cashier's checks in the amounts of $565,000, $675,000, $528,000, and $1,462,000 total $3.5 million, which is the full amount of the loan. Out of the $3.5 million, $1.99 million was paid to CMG, the general contractor.

¶ 10    On July 8, 2014, National Life filed a motion for entry of judgment against IBC for allegedly violating the citation to discover assets that it was served on April 13, 2013, arguing that IBC violated the prohibitive provision of the citation when it transferred $3.5 million in assets belonging to Scarlato. Specifically, the motion stated that through supplemental responses to the citation that were filed in February and April 2014, National Life learned that IBC loaned Scarlato $3.5 million in connection with a construction loan and line of credit in August 2013 and that IBC subsequently disbursed, transferred, and paid the proceeds of this loan to at least one third-party. The motion also argued that by serving the citation on IBC on April 13, 2013, National Life perfected a lien on all of Scarlato's assets and monies in IBC's control, and thus, a judgment against IBC should be entered.

¶ 11    IBC filed its response on July 30, 2014, asserting that at no time did the August 1, 2013, loan or its proceeds constitute property "belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her," as required by section 2-1402(f)(1) of the Code of Civil Procedure (Code). 735 ILCS 5/2-1402(f)(1) (West 2012). Additionally, IBC contended that it never transferred any assets of Scarlato or otherwise violated its duties under the citation. In the alternative, IBC argued that

even if the court found that the August 1, 2013, loan or its proceeds constituted Scarlato's property under the Code, IBC had a right to set off the balances on the existent notes of Scarlato with such property pursuant to the terms of the September 2008 note and the October 2012 note, which predated service of the citation, and pursuant to the terms of the note for the August 1, 2013, loan. As support for its response, IBC attached, *inter alia*, the affidavit of IBC vice president George Anderson. In his affidavit, Anderson averred that, "[t]he proceeds of the August 1, 2013 Loan were only used to pay monies due for completion of the building construction on the Real Property, EB-5[1] licensing obligations or to protect the security interests of IBC in the Real Property." Anderson also stated that, "Scarlato, the individual[,] had no power or right to direct the actions of Warren Tai or me with respect to disbursement or use of the August 1, 2013 Loan proceeds." Anderson stated that all payments charged to the August 1, 2013, loan were made by IBC cashier's checks or drawn from a BP checking account, on which he and Warren Tai were the only signatories. Finally, Anderson attested that, "[a]t no time did Ronald Scarlato receive any of the proceeds of the August 1, 2013 Loan," and "[a]t no time did the proceeds from the August 1, 2013 Loan pass through an account owned or controlled by Ronald Scarlato."

¶ 12    National Life replied on August 18, 2014, reemphasizing that the citation served upon IBC on April 13, 2013, prohibited the transfer of any of Scarlato's assets, and rearguing that the loan proceeds were, in fact, Scarlato's property because contrary to IBC's assertion that it had complete control over the proceeds, Scarlato had authority over them. Additionally, National Life argued that IBC's purported right to setoff is inapplicable, judgment against IBC would not be inequitable, and National Life was also entitled to an award of attorney fees.

¶ 13    On December 16, 2014, the circuit court held an evidentiary hearing on National Life's motion for entry of judgment. IBC called its executive vice president, Warren Tai, to testify on its behalf. Tai testified that in order to ensure the loan proceeds did not go to Scarlato, he would review and authorize any disbursements before they were made. Prior to him, George Anderson, who was no longer with the bank at the time of Tai's testimony, would review the disbursements. Tai also testified that there were two accounts in BP's name to which loan proceeds were disbursed. However, Scarlato was not a signatory on either account and did not have access to the funds therein. IBC also called as a witness Scarlato, who testified that he never personally received any of the proceeds of the $3.5 million loan. Scarlato also stated that he was not a party to the construction contract with CMG. National Life relied on documentary evidence and did not call any witnesses. At the end of the hearing, the court asked both sides to submit their own proposed findings of facts, conclusions of law, and proposed judgments, which both parties thereafter filed on February 5, 2015. The hearing continued on February 10, 2015, when the parties made their closing arguments.

¶ 14    On April 15, 2015, the circuit court entered a memorandum decision and order that primarily adopted National Life's proposed findings of fact. As to the first issue of whether National Life's motion should be granted, the court agreed with IBC, noting that although Scarlato was a party to the agreement and note, which were both executed in conjunction with

---

[1]Anderson also stated in his affidavit that "EB-5" referred to the Immigration Investment Program administered by the U.S. Citizenship and Immigration Services that was entered into by BP, SHBP, and Scarlato. Under the EB-5 program, foreign nationals receive conditional resident status in the United States in exchange for making a capital investment in the United States that will benefit the economy.

the August 1, 2013, loan, "[t]he record does not show that the assets were assets of Scarlato individually." The court ultimately determined that:

> "Scarlato, as a contracting party in the Construction Loan, is liable for the amounts and was the individual with the authority to request amounts. However, the checks clearly show the amounts were delivered to entities and not Scarlato individually. The Court recognizes the frustration in this matter. However, the parties do have remedies remaining. With that said, the court denies National's motion for entry of judgment against IBC."

¶ 15    National Life filed its first notice of appeal on May 14, 2015. In *National Life Real Estate Holdings, LLC v. International Bank of Chicago*, 2016 IL App (1st) 151446, ¶¶ 16, 18, we dismissed the appeal, finding that we lacked jurisdiction because the trial court's order that denied National Life's motion for entry of judgment was not final and appealable. On March 30, 2016, National Life brought a motion in the circuit court for a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), IBC filed its response on May 24, 2016, and National Life replied on June 7, 2016. On June 14, 2016, the circuit court entered an order granting National Life's motion and making a finding that, "[p]ursuant to Illinois Supreme Court Rule 304(a), there is no just reason to delay enforcement or appeal or both, of this Court's April 15, 2015 Order denying National Life Real Estate Holdings, LLC's motion for entry of judgment against International Bank of Chicago." The citation directed to IBC remains pending.

¶ 16    National Life filed its notice of the instant appeal on July 13, 2016.

¶ 17                                     II. ANALYSIS

¶ 18    National Life argues that the trial court erred in denying its motion for entry of judgment. The parties disagree as to the applicable standard of review in this appeal. National Life argues that, because the facts are uncontroverted, the issue on appeal involves the trial court's application of the law to the facts, and this appeal involves a question of statutory interpretation, our review should be *de novo*. See *Quinlan v. Stouffe*, 355 Ill. App. 3d 830, 836 (2005); *Itasca Bank & Trust Co. v. Thorleif Larsen & Son, Inc.*, 352 Ill. App. 3d 262, 265 (2004). Conversely, IBC contends that a manifest weight of the evidence standard applies because *de novo* review is only appropriate where the circuit court did not conduct an evidentiary hearing or make any findings of fact, and here the court did both. See *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 285 (2007). Further, IBC asserts that to the extent National Life challenges the trial court's use of discretion, an abuse of discretion standard should apply. See *Bank of America, N.A. v. Freed*, 2012 IL App (1st) 113718, ¶ 26.

¶ 19    In its reply, National Life asserts that when the issue involves a question of statutory interpretation, even if the court held an evidentiary hearing, this court's review is *de novo*. See *People v. Lesure*, 408 Ill. App. 3d 12, 18 (2011). Specifically, the court in *Lesure* recognized that, "[t]ypically, we would not reverse a determination made by the trial court following an evidentiary hearing unless that determination were manifestly erroneous. [Citations.] However, because petitioner raises a question of statutory interpretation, we review *de novo*. [Citation.]" *Id.*

¶ 20    We believe that the primary issue before this court is whether the trial court properly determined that IBC did not violate the restraining provision of the citation. However, in order to answer that question, we must first determine whether the proceeds of a loan are to be

considered "property *** belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her" such that the advance and disbursement of said proceeds constitutes a violation. See 735 ILCS 5/2-1402(f)(1) (West 2012). Whether IBC's conduct amounts to a violation of the citation is a question of law and requires us to engage in statutory interpretation. Thus, although the trial court conducted an evidentiary hearing that normally necessitates a manifestly erroneous standard, our review is *de novo*. *Lesure*, 408 Ill. App. 3d at 18.

¶ 21    We first look to the section of the Code that National Life claims that IBC violated. Section 2-1402(f)(1), in its entirety, reads:

> "The citation may prohibit the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment therefrom, a deduction order or garnishment, belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her, and from paying over or otherwise disposing of any moneys not so exempt which are due or to become due to the judgment debtor, until the further order of the court or the termination of the proceeding, whichever occurs first. The third party may not be obliged to withhold the payment of any moneys beyond double the amount of the balance due sought to be enforced by the judgment creditor. *The court may punish any party who violates the restraining provision of a citation as and for a contempt, or if the party is a third party may enter judgment against him or her in the amount of the unpaid portion of the judgment and costs allowable under this Section, or in the amount of the value of the property transferred, whichever is lesser.*" (Emphasis added.) 735 ILCS 5/2-1402(f)(1) (West 2012).

¶ 22    As the foregoing italicized language of section 2-1402(f)(1) makes clear, a court may exercise its discretion in determining whether to punish a third-party citation respondent that is found to have violated the restraining provision of the citation. The third-party citation that was served on IBC on April 13, 2013, contained language similar to section 2-1402(f)(1). Specifically, the citation read:

> "*YOU ARE PROHIBITED* from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings. You are not required to withhold the payment of any money beyond double the amount of the judgment." (Emphasis in original.)

"The purpose underlying the restraining provision of section 2-1402 is to provide 'a means of forestalling the judgment debtor or a third party from frustrating the supplementary proceedings before the judgment creditor has had an opportunity to reach assets, *** in the possession of [the] debtor or of a third party.' " *Bank of Aspen v. Fox Cartage, Inc.*, 126 Ill. 2d 307, 314 (1989) (quoting *Kirchheimer Brothers Co. v. Jewelry Mine, Ltd.*, 100 Ill. App. 3d 360, 362 (1981)).

¶ 23    National Life argues that the language of the citation prohibited IBC from transferring, disbursing, or otherwise disposing of Scarlato's property. IBC responds that the loan proceeds at issue were not Scarlato's property. Thus, we must determine whether the loan proceeds did,

in fact, "belong" to Scarlato within the meaning of the Code, and thus whether IBC violated the restraining provision of the citation when it entered into the agreement with Scarlato and the two LLCs and subsequently disbursed the loan proceeds.

¶ 24 We find it pertinent to note that in support of its argument that the loan proceeds were Scarlato's property within the meaning of section 2-1402, National Life does not cite to any Illinois case law. Instead, National Life points out the dearth of cases from Illinois and cites to numerous federal and out-of-state cases to support its position. Primarily, National Life relies on *United States v. Kristofic*, 847 F.2d 1295, 1295 (7th Cir. 1988), wherein the defendant was convicted of converting $50,000, which was in the form of proceeds of a loan from the Small Business Administration. The issue before the court was whether a person who misapplies the proceeds of a federal government loan may be charged with conversion of United States property. *Id.* The court ultimately reversed the defendant's conviction, finding that the elements of conversion were not present where the federal government did not retain a property interest in the loan proceeds once the loan agreement was entered into. *Id.* at 1299. Specifically, the court recognized that, "[a]s a matter of basic principles, loan proceeds do not remain the property of the lender" and further acknowledged that "[u]ndertaking an obligation to repay and agreeing to conditions contained in loan documents do not make a debtor a trustee for her creditor; the creditor does not, by virtue of these conditions, remain in any degree the owner of the proceeds." *Id.* at 1296-97.

¶ 25 National Life also cites, *inter alia*, to two Washington cases, *State v. Gillespie*, 705 P.2d 808, 811 (Wash. Ct. App. 1985), and *State v. Berman*, 747 P.2d 492, 495 (Wash. Ct. App. 1987), that support the proposition that title to loan proceeds made upon a promissory note pass to the borrower upon the signing of the note. Similarly, National Life cites to another federal case, *In re Southwestern Glass Co.*, 332 F.3d 513, 518 (8th Cir. 2003), wherein the court determined that funds disbursed from a line of credit constitute property of the debtor and are therefore subject to a garnishment claim.

¶ 26 In its response, IBC also fails to set forth any Illinois law that supports its position but argues that the cases relied on by National Life lack precedential authority and are distinguishable from the instant matter. Specifically, IBC contends that the loan transaction in *Kristofic* was typical and the loan at issue here was not because IBC made certain that other than signing the agreement and note, Scarlato had nothing to do with the disbursement of the loan proceeds. Additionally, IBC points out that the two Washington cases relied on by National Life are criminal in nature and involved claims of embezzlement.

¶ 27 Looking at the cases presented by National Life, we acknowledge that the "use of foreign decisions as persuasive authority is appropriate where Illinois authority on point is lacking or absent." *Rhone v. First American Title Insurance Co.*, 401 Ill. App. 3d 802, 812 (2010). However, we do not believe that Illinois case law completely lacks insight that would help answer the questions we face here. Thus, we decline to solely rely on the federal and foreign cases set forth by the parties.

¶ 28 In addition to examining the cases cited by the parties and relied on by us in the majority, we also find it important to differentiate the authority relied on by the dissent and the conclusions drawn therefrom. The dissent relies heavily on *Guillory v. Terra International, Inc.*, 613 So. 2d 1084, 1088 (La. Ct. App. 1993), wherein the court found that crop production loan proceeds were not garnishable where "[t]he advances were earmarked for the particular purpose of growing the present year's crops." However, it appears from the factual background

presented in that case that the crop production loan at issue was extended to the judgment debtor *before* the bank was served with the garnishment. *Id.* at 1086. We find that scenario at odds with the facts before us where IBC extended an entirely new loan to Scarlato after being served with National Life's third-party citation. In *Guillory*, the terms of the crop production loan, namely the provision that required the funds to be used solely for crop production-related purchases, was already existent at the time the bank was served with the garnishment. *Id.* Conversely, in this case, IBC and Scarlato did not draft the loan agreement prior to service of the citation. We recognize that the loan at issue here is not the only loan extended to Scarlato by IBC. However, we also find relevant the fact that the record does not contain evidence that the terms of the other loans were similar to the terms that restricted Scarlato's access to the funds. The fact that such restrictive terms were only incorporated into the loan agreement after IBC was served with the citation appears suspicious at best. In *Guillory*, that the parties were unaware of the garnishment proceeding at the time they entered into the crop production loan agreement speaks volumes regarding the parties' intentions. We find the difference between this case and the *Guillory* case to be crucial where one of our primary concerns is preventing parties from artfully drafting loan agreements in order to avoid the reach of supplemental proceedings.

¶ 29 We similarly find *Morphet v. Morphet*, 19 Ill. App. 2d 304 (1958), another case relied on by the dissent, to be inapplicable to the factual scenario here. The underlying case in *Morphet* was a garnishment action between a former husband and wife wherein the wife filed a garnishment, seeking to reach her ex-husband's annuity benefit plan that was held by his employer. *Id.* at 305-06. When the husband left his employment with the company through which he was provided the annuity, he had two options: (1) cancel the annuity and accept the then cash value or (2) accept an annual annuity to commence upon his retirement. *Id.* at 306. However, the husband did not opt for either. *Id.* at 307. Thus, on appeal, the garnishee argued that the claim against it was contingent and, therefore, not subject to attachment. *Id.* at 306. The court agreed with the garnishee and held "[u]ntil defendant exercises his option in the manner prescribed by the [c]ontract, the garnishee's liability to him for such cash value of his contributions remains contingent." *Id.* at 307.

¶ 30 The dissent relies on *Morphet* to support its proposition that "assets, like the ones at issue here, that a debtor would have no legal right to access cannot be garnished by the debtor's creditor." While we agree that a creditor does not have any rights greater than the debtor himself, we simply disagree that such a proposition applies here. Simply put, we believe Scarlato did, in fact, have a legal right to access the proceeds of the loan at issue here. Thus, we believe reliance on *Morphet*, or cases of the like, is misplaced.

¶ 31 "Section 2-1402 provides a method by which a judgment creditor may begin supplementary proceedings against a third party as a means of discovering assets belonging to the judgment debtor that the third party may have in its possession." *Bank of Aspen*, 126 Ill. 2d at 313. "The judgment creditor may commence the supplementary proceedings by requesting the clerk of the circuit court to issue a citation to the third party who is thought to be in possession of the judgment debtor's property." *Id.*

¶ 32 "Before a judgment creditor may proceed against a third party who is not the judgment debtor, the record must contain some evidence that the third party possesses assets of the judgment debtor." *Schak v. Blom*, 334 Ill. App. 3d 129, 133 (2002). Further, "[t]he provisions of section 2-1402 are to be liberally construed, and the burden lies with the petitioner to show

that the citation respondent possesses assets belonging to the judgment creditor." *Id.* "[T]he only relevant inquiries in supplementary proceedings are (1) whether the judgment debtor is in possession of assets that should be applied to satisfy the judgment or (2) whether a third party is holding assets of the judgment debtor that should be applied to satisfy the judgment." *Id.*

¶ 33 Here, our focus is on the second inquiry because IBC is a third-party citation respondent. National Life argues that under section 2-1402 of the Code, the loan proceeds were Scarlato's property and subject to the citation. National Life asserts that the trial court was wrong and must be reversed where the sole basis for its decision to deny the motion was that "the checks clearly show the amounts were delivered to entities and not Scarlato individually." National Life contends that even though the loan proceeds were not disbursed to Scarlato, they still *belonged* to him within the meaning of section 2-1402.

¶ 34 IBC responds that National Life's position ignores that Scarlato was one of three borrowers and that none of the loan proceeds were ever disbursed or distributed to him. Also, IBC emphasizes that the agreement gave IBC the authority, as attorney-in-fact, to directly pay contractors and subcontractors. IBC relies on the uncontroverted testimony of Tai and Scarlato, arguing that there were pervasive controls and restrictions implemented in order to prevent Scarlato from having access or control of the loan proceeds. As a result, IBC contends that the mere fact that Scarlato, who is essentially a co-signer, agreed to become indebted for $3.5 million to IBC is insufficient to establish that the loan proceeds were his property under section 2-1402, especially where the loan proceeds were used to satisfy obligations of BP and SHBP and not Scarlato.

¶ 35 We conclude that the proceeds of the loan here constituted "property *** belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her" such that the advance and disbursement of said proceeds constitutes a violation. In examining section 2-1402 to determine whether the loan proceeds were Scarlato's "property," we rely on the rules of statutory construction. "In construing a statute, our primary objective is to ascertain and give effect to the legislature's intent, which is best indicated by the statute's plain language." *Kauffman v. Wrenn*, 2015 IL App (2d) 150285, ¶ 28. Thus, "[i]f the statutory language is clear, we must apply it as written, without resorting to extrinsic aids of statutory construction." *Id.*

¶ 36 The provisions of section 2-1402 are to be construed liberally (*Schak*, 334 Ill. App. 3d at 133), and we believe that a liberal reading of the language of section 2-1402 shows the legislature's intent to broadly frame the scope of the "property" to which a citation should apply. Specifically, we believe the language "belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her" is very open-ended and can reasonably be interpreted to apply to a loan's proceeds, even where here, the funds were not disbursed to the judgment debtor. 735 ILCS 5/2-1401(f)(1) (West 2012). Even though Scarlato did not receive the disbursements directly, he was a signatory on the agreement, note, and assignment in his individual capacity. If the loan documents were only signed by the LLCs, then there would not be a question as to whether the loan proceeds were Scarlato's property. Further, Scarlato, in his individual capacity, also signed the disbursement request and authorization. We find that his signature on this request evidences his control over the loan proceeds. Although the dissent labels Scarlato's control as "limited" (*infra* ¶ 56), we believe it is crucial that he had control nonetheless. We further believe that one who has control over loan proceeds also has entitlement thereto. Here, at various times, the

loan proceeds passed through BP's bank accounts. As a managing member of BP, Scarlato has rights to those accounts even if, according to Anderson and Tai, he was not a signatory thereon. Additionally, both the note and agreement listed Scarlato, both individually and as managing member of the two LLCs, as the sole individual with authority to request advances, which is further evidence of his control over the loan proceeds. Arguably, Scarlato could have used the loan proceeds for his own personal use or for payment to an entity outside of the construction project. Of course, if Scarlato had done so, IBC may have had a cause of action against him for violation of the terms of the loan agreement. However, we believe that the issue of whether the restraining provision of a citation was violated is best examined without the benefit of hindsight. Even though we now know that the loan proceeds were only used to pay for construction project expenses, we still do not find that merely because the loan agreement stated that Scarlato could not personally use the funds signified that it was not possible for him to do so. It is clear from the record that IBC was well aware of the third-party citation to discover assets and took precautions to ensure that the proceeds of the loan were never placed into an account bearing Scarlato's name. There was also language in the agreement that allowed IBC, at its own option, to directly pay the general contractors or subcontractors. However, this language does not remove Scarlato's control over the proceeds but rather gives IBC control over the proceeds as well.

¶ 37    We also find applicable the Seventh Circuit's decision in *Kristofic*. Although that was a criminal case involving the theft, embezzlement, or conversion of government property, we believe the logic expressed therein is relevant here. The court in *Kristofic* explicitly recognized that "[a]s a matter of basic principles, loan proceeds do not remain the property of the lender." *Kristofic*, 847 F.2d at 1296. Additionally, the court did not limit its analysis to the criminal context when it stated, "[u]ndertaking an obligation to repay and agreeing to conditions contained in loan documents do not make a debtor a trustee for her creditor; the creditor does not, by virtue of these conditions, remain in any degree the owner of the proceeds." *Id.* at 1297. We believe that it is reasonable to presume that if loan proceeds do not remain the property of the lender, then they must become the property of the debtor. Simply put, someone must be the owner of the funds. We anticipate that IBC would argue that the loan proceeds are the property of the lender until disbursed and become the property of the one who received the disbursement (in this case, Greater Illinois Title Company, for example) upon receipt. However, this requires us to accept the premise that a loan's proceeds never become the property of the borrower unless disbursed directly to the borrower. We find this nonsensical where a borrower is obligated to repay the amount of the loan whether he or she directly received the disbursement or not. If a borrower were not obligated as such, then it would be foreseeable that a borrower could argue that they need not pay back a loan that never became their property.

¶ 38    IBC argues that the loan at bar is not typical like the loan in *Kristofic*. However, IBC fails to cite to and we have not found any case law that stands for the proposition that whether a loan is "typical" is dispositive of whether loan proceeds should be treated as a borrower's property. Thus, we do not find IBC's refutation of the *Kristofic* case to be convincing.

¶ 39    As previously noted, it is clear from the record, specifically Tai's testimony, that IBC took precautions to prevent the loan transaction at issue here from falling within the purview of the citation that was served upon it. IBC does not dispute that it was served with the citation and does not even contest that it was aware of the restraining provision of the citation. Rather, it

sets forth the steps it took to extend Scarlato a $3.5 million loan while also attempting to avoid violating the restraining provision of the citation. "The purpose underlying the restraining provision of section 2-1402 is to provide 'a means of forestalling the judgment debtor or a third party from frustrating the supplementary proceedings before the judgment creditor has had an opportunity to reach assets, *** in the possession of [the] debtor or of a third party.' " *Bank of Aspen*, 126 Ill. 2d at 314. To allow third-party citation respondents to engage in the evasive conduct that IBC engaged in here would frustrate the purpose of the restraining provision of section 2-1402. Although the dissent notes that there was no evidence that the restrictions on the funds disbursed by IBC were imposed to disguise or divert funds that otherwise would have been loaned for Scarlato's personal use (*infra* ¶ 55), we disagree that such an inquiry is relevant. Certainly, the legislature enacted 2-1402 so that judgment creditors would be able to reach a judgment debtor's assets that he or she did not personally hold. If judgment debtors, like Scarlato, are able to enter into loan agreements with third-party lending institutions that merely include language restricting the debtor's ability to access the funds, while at the same time allowing the debtor the authority to request disbursements, it would create an avenue by which judgment debtors would be able to avoid the consequences of the judgment. We acknowledge that Scarlato was one of three borrowers and he became jointly and severally liable for the repayment of the loan. However, we do not find convincing IBC's argument that none of the loan proceeds were used to satisfy Scarlato's obligations. As we have previously mentioned, because National Life brought its motion for entry of judgment *after* all of the loan proceeds had been disbursed, IBC has the benefit of hindsight. Due to the timing of the motion, we know that none of the proceeds were directly distributed to Scarlato and we know that the agreement explicitly stated that they were not to be. We emphasize that merely because the agreement prohibited it and merely because no direct disbursement to Scarlato occurred does not signify that the proceeds of the loan were not Scarlato's property. We, therefore, find that extending a loan to a judgment debtor after having been served with a citation to discover assets runs contrary to section 2-1402's prohibition on allowing transfer or disposition of property belonging to the judgment debtor.

¶ 40    Further, we find that IBC violated the restraining provision of the citation when it advanced and disbursed the proceeds of a $3.5 million loan on behalf of Scarlato. In its decision, the trial court stated, "[t]he record does not show the assets were assets of Scarlato individually" but it did not explicitly find that IBC did not violate the restraining provision of the citation. However, it is clear from the trial court's order that it impliedly found the citation was not violated, which is contrary to our decision here. The dissent suggests that there was no basis for a judgment against IBC. However, that is not the issue before us. We need merely determine whether the trial court properly decided that the restraining provision of the citation was violated. It is up to the trial court to exercise its discretion in determining whether to punish IBC for violating the citation. Because the trial court did not find the citation was violated, it never exercised its discretion in determining whether to punish IBC. See 735 ILCS 5/2-1402(f)(1) (West 2012) ("[t]he court may punish any party who violates the restraining provision of a citation as and for a contempt, or if the party is a third party may enter judgment against him or her in the amount of the unpaid portion of the judgment and costs allowable under this Section, or in the amount of the value of the property transferred, whichever is lesser"). We, therefore, vacate the court's April 15, 2015, order pursuant to our finding that IBC did, in fact, violate the citation, and further order that this case be remanded to the trial

court so that the trial court may exercise its discretion and determine whether to enter judgment against IBC in light of our decision.

¶ 41　　In the alternative, IBC argues that even if the loan proceeds were found to be Scarlato's property, which they have been, then judgment should still not enter against it because of its right to setoff. IBC points to the setoff provisions contained in both the September 2008 note and the October 2012 note, in which IBC reserved "a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future." National Life responds that a right of setoff does not apply to the loan or loan proceeds because if IBC is allowed to use the loan proceeds to set off other indebtedness, then IBC would essentially be increasing the balance and amount owed on the loan at issue in this appeal in order to decrease the balance and amount owed on another loan. National Life argues even if setoff is applicable here, it does not excuse IBC from complying with the citation. Regardless, National Life asserts that IBC has waived its right to setoff. We agree.

¶ 42　　Again finding a dearth of Illinois law on this subject, we look to *One CW, LLC v. Cartridge World North America, LLC*, 661 F. Supp. 2d 931, 936 (N.D. Ill. 2009), in which the court recognized that a citation respondent or garnishee who seeks to assert a right to setoff "also must comply with the duties of a garnishee." Here, we have found that IBC failed to comply with the citation's restraining provision and thus did not fulfill its duties, similar to the respondent in *One CW, LLC*. However, we further find that, until its response to National Life's motion for entry of judgment, IBC did not assert its right to setoff. Its original answer to the citation did not contain any reference thereof and neither did any subsequent supplemental answers. In *One CW, LLC*, the court stated that the garnishee "has claimed a right to set-off, but has failed to take any steps to actually exercise this right." *Id.* We find this case to be similar where IBC failed to take any steps to assert its right to setoff outside of its response to the motion for judgment, and so any right of setoff has been forfeited. Although the parties here and the court in *One CW, LLC*, use the term "waiver," we find that National Life actually forfeited its setoff claim. "[W]aiver arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right." (Internal quotation marks omitted.) *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007). Conversely, forfeiture is the "failure to make the timely assertion of the right." (Internal quotation marks omitted.) *Id.* at 229-30. Here, National Life failed to timely assert its purported right to setoff; thus forfeiture applies.

¶ 43　　Further, even if we had not found the right to setoff was forfeited, we would still find it inapplicable where "[t]he judgment or balance due on the judgment becomes a lien when a citation is [properly] served" (735 ILCS 5/2-1402(m) (West 2012)). The service of the citation on IBC predated any attempt to assert its right to setoff, and thus, the lien created by the citation would take priority even if the right to setoff had not been forfeited.

¶ 44　　　　　　　　　　　　　III. CONCLUSION

¶ 45　　Based on our foregoing finding that IBC violated the restraining provision of the citation, we vacate the court's April 15, 2015, order and remand for a hearing wherein the circuit court is directed to exercise its discretion and determine whether to punish IBC under section 2-1402.

- 13 -

¶ 46   Order vacated and remanded with directions.

¶ 47   JUSTICE MIKVA, dissenting.

¶ 48   I respectfully disagree with the majority's conclusion, *supra* ¶¶ 35, 40, that IBC violated the restraining provision of the citation issued by National Life because loan proceeds disbursed to third parties were "property *** belonging to [Mr. Scarlato]" (735 ILCS 5/2-1402(f)(1) (West 2012)). It was National Life's burden, as judgment creditor, to establish this fact (*Schak*, 334 Ill. App. 3d at 133), and I believe the circuit court correctly concluded that it failed to do so. The cases relied on by the majority, standing for the proposition that loan proceeds generally belong to the borrower and not to the lender (see, *e.g.*, *Kristofic*, 847 F.2d at 1296-97), do not involve proceeds like those at issue here, which were not under the unfettered control of the borrower, but were instead earmarked for distribution to third parties for a very specific purpose. Although Mr. Scarlato became indebted for the construction loan, the undisputed evidence established that the loan proceeds could only be used for completion of the construction project. See *supra* ¶¶ 8, 11. The loan proceeds were simply not Scarlato's property because, as the trial court noted, they were never delivered to Scarlato and, as the facts make clear, the loan agreement did not entitle him to use them for his own purposes.

¶ 49   It is a basic principle that "[a] judgment creditor in Illinois has no greater rights in an asset than does the judgment debtor." *Pacific Reinsurance Management Corp. v. Fabe*, 929 F.2d 1215, 1219 (7th Cir. 1991). Although this principle is most often applied in garnishment proceedings (see, *e.g.*, *Bank of Homewood v. Gembella*, 48 Ill. App. 2d 316, 319 (1964) ("In garnishment proceedings the judgment creditor has no greater rights to any funds held by a third party than has the judgment debtor. [Citation.] The claim asserted against the garnishee must be one which the judgment debtor himself could have maintained.")), it has also been applied in citation proceedings.

¶ 50   In *Bank of Homewood*, for example, a judgment creditor appealing from an order entered in a citation proceeding sought the balance of a loan due to a judgment debtor that was held by a third-party lender. *Id.* at 317-18. The terms of the loan required the judgment debtor to meet certain conditions before he could claim the full benefit of the loan, and this court concluded that the judgment creditor, "being in no better position, [could] claim no greater rights thereto." *Id.* at 319. See also *For Your Ease Only, Inc. v. Calgon Carbon Corp.*, No. 02 C 7345, 2009 WL 3255317, at *2, *4 (N.D. Ill. Oct. 6, 2009) (holding in a citation proceeding that, where the judgment debtors had no legal right to funds held in reserve to pay future commissions as they became due, their judgment creditor "ha[d] no greater right to [those] funds").

¶ 51   There is limited precedent in Illinois or elsewhere on the rights of creditors to reach funds advanced by third-party lenders in a citation proceeding. However, section 2-1402 expressly incorporates "the law relating to garnishment proceedings" for the resolution of disputes over discovered assets (735 ILCS 5/2-1402(g) (West 2012)) in a citation proceeding. The statutorily required language in a citation notice also mirrors that of an affidavit of garnishment (compare 735 ILCS 5/2-1402(b) (West 2012) (citation notice applies to "assets belonging to the judgment debtor or in which the judgment debtor has an interest"), with 735 ILCS 5/12-701 (West 2012) (affidavit of garnishment applies to "property belonging to the judgment debtor, or in which the judgment debtor has an interest")).

¶ 52   It is well-settled in garnishment proceedings that assets, like the ones at issue here, that a debtor would have no legal right to access cannot be garnished by the debtor's creditor. For

- 14 -

example, in *Morphet v. Morphet*, 19 Ill. App. 2d 304, 307 (1958), the court held that, until a judgment debtor exercised his option in the manner prescribed by his contract with the garnishee, the garnishee's liability to him for the cash value of his contributions to an annuity remained contingent and was not subject to garnishment. *Cf. Baron v. Villareal*, 100 Ill. App. 2d 366, 373 (1968) (holding insureds could not recover from their own insurer the amount of judgments rendered in their favor against an uninsured motorist through garnishment proceedings because "a claim asserted by a judgment creditor against a garnishee must be one which the judgment debtor himself could have maintained").

¶ 53    I find the Louisiana case *Guillory v. Terra International, Inc.*, 613 So. 2d 1084, 1089-90 (La. Ct. App. 1993), particularly instructive. There, the court held that, although the proceeds of a crop production loan were "placed to the credit of the borrower on the books of the bank," limitations providing that the proceeds only be used for provisions and supplies necessary for that year's crop "impose[d] a limitation upon the rights of [the borrower]'s creditors" as well, who "[could not] acquire any greater right in the property of [the] debtor than the debtor himself ha[d]." The court held that the crop production loan proceeds could therefore not be garnished. *Id.* at 1090. The loan at issue here is strikingly similar to the loan at issue in *Guillory*, where the advances were "earmarked for [a] particular purpose" and, thus, the debtor's interest in the loan "could not be subject to garnishment." *Id.* at 1088. There the funds could only be used to plant and harvest a specific crop, while here they could only be used to complete the construction of a specific building. National Life, like the judgment creditor in *Guillory*, has no ability to disregard the restrictions placed on the funds. Unlike the majority, I do not view this as an expansion of the law but as a straightforward application of recognized principles governing the rights of judgment creditors that they can have no greater right to the funds at issue than the debtor.

¶ 54    While I agree with the majority that section 2-1402 is to be liberally construed, since the loan proceeds at issue here were not property belonging to Mr. Scarlato, there is no basis for the judgment against IBC that National Life is seeking based on what National Life claims was a violation of the citation. "If [a] third party possesses no assets of the judgment debtor, then the court has no authority to enter any judgment against the third party in a supplementary proceeding." *Ericksen v. Rush-Presbyterian-St. Luke's Medical Center*, 289 Ill. App. 3d 159, 166-67 (1997). See also *Schak*, 334 Ill. App. 3d at 133 ("[n]othing in the Code authorizes the entry of a judgment at a supplementary proceeding against a third party who does not possess assets of the judgment debtor"). See also 735 ILCS 5/2-1402(c) (West 2012) (giving courts broad authority to enter appropriate orders or judgments "[w]hen assets or income of the judgment debtor *** are discovered").

¶ 55    Although I recognize that, as the majority cautions (*supra* ¶ 39), third-party citation respondents and judgment debtors may be motivated to engage in "evasive conduct" designed to frustrate the restraining provision of a citation, nothing in the record suggests to me that IBC did so in this case. Indeed, in its motion for entry of a judgment against IBC, National Life stated that it learned of the construction loan at least in part from information disclosed by IBC in the supplemental proceedings. Likewise, nothing in the record suggests that the restrictions on the funds disbursed by IBC under the construction loan were imposed to disguise or divert funds that would otherwise have been loaned to Mr. Scarlato for his own personal use, rather than to ensure that the funds were used for the legitimate purpose of completing a construction

project for which IBC had already loaned considerable funds. I disagree with the majority that, in disbursing funds in this manner, IBC violated the citation.

¶ 56　　　　In sum, I agree with the majority that loan proceeds are generally the property of the borrower and not the lender. I also agree that a loan might be property of the debtor in a citation proceeding—even where the loan proceeds are not paid directly to the debtor/borrower but distributed to a third party—if the debtor/borrower had the legal right to obtain those funds. Given the facts of this case, however, I respectfully disagree that these loan proceeds were subject to the restraining provision of the citation issued by National Life. The limited control the construction loan agreement granted to Mr. Scarlato to request disbursements to construction contractors for completed work and his personal obligation to repay the loan to IBC did not entitle him to the funds personally. If Mr. Scarlato had no legal right to access the funds, they were not property "belonging to" him for purposes of section 2-1402 and IBC's distribution of those funds was not a violation of the citation. For these reasons, I would affirm the judgment of the circuit court.